**Jeannine W. WILKINS et al.**

v.

**UNIVERSITY OF HOUSTON, et al.**

Civ. A. No. 75–H–644.

United States District Court,
S. D. Texas,
Houston Division.

June 13, 1979.

MEMORANDUM

STERLING, District Judge.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiffs, Jeannine Wilkins and Sharon Hill, brought this civil action individually and on behalf of all female, past, present and future faculty and professional and administrative employees of Defendants, the University of Houston (University) and KUHT–TV (KUHT), seeking redress against Defendants for alleged violations of Title VII, 42 U.S.C. § 2000e et seq., Art. I, Section 3a of the Texas Constitution, and the Equal Pay Act, 29 U.S.C. § 201 et seq., on the basis of sex discrimination in employment practices. Plaintiffs contend that the Defendants discriminated against women with regard to hiring, job assignments, promotions and wages. The case was tried before the court from June 20, 1978, until July 3, 1978. A third named Plaintiff, Tricia Burrett, could not be located at the time of trial and was dismissed from the case. The court, having considered the evidence, enters the following findings of fact and conclusions of law.

## FINDINGS OF FACT

*The Class Claims*

1. The Defendants' policies, practices, customs and usages since 1972 have not discriminated against women with regard to hiring, job assignments, promotions, wages and other terms of employment.

2. Plaintiffs through their statistical analysis (Plaintiffs' Exhibits 39A–F, 41) have failed to prove by a preponderance of the evidence that Defendants' employment practices provide disparate treatment to men and women faculty members. The crucial failure in Plaintiffs' case as to hiring is in the showing of availability of qualified women for particular job assignments. No credible showing was made that qualified women were available to be hired into the technical schools of the University such as the engineering, natural science and law schools that were shown in Plaintiffs' Ex-

Nelkin & Nelkin, Carol Nelkin, Houston, Tex., for plaintiffs.

Lonny F. Zweiner, Asst. Atty. Gen. of Texas, Austin, Tex., for defendants.

hibit 37 as lacking in female full-time faculty members. Although the past paucity of women in the various departments indicated in Plaintiffs' Exhibit 37 presents a prima facie case, the court is convinced by the Defendants' evidence that such low numbers of women were due to the lack of women available and qualified in the national market place for such positions.

3. Plaintiffs' evidence as to the University's recruitment policies falls far short of proving a pattern of discrimination. Although the proof indicates some hiring of applicants who are personally known by faculty members and recruiting committees, there is no evidence that women "that are known" are excluded from consideration because of their sex. Plaintiffs' accusation that University's hiring is standardless, arbitrary, and "cliquish" constitutes a complaint against the nature of the academic community, but does not prove sex discrimination in the University's hiring policies. The proof indicated that recruiting was done on a nationwide basis, and that positions were advertised and applicants were interviewed in a manner devoid of any sexual discrimination.

4. With regard to promotions, the court heard lengthy testimony as to the University's practices in promoting faculty from an entry level position of an untenured assistant professor on up the academic hierarchy. The court finds that the decision making on tenure and promotion is indeed based on highly subjective qualifications, but cannot condemn the practice as discriminatory in result. The University is unlike an industrial plant where more precise qualifications for promotion can be distinguished, consolidated, and put into print. The court finds no such discrimination in the Defendants' promotion practices and policies, and finds that a subjective procedure for promotion is a necessary, indispensable, and bona fide means for determining promotion in the academic field.

5. The court finds that any variations in salary among faculty men and women were due to market place values imposed upon the various schools of the University. Since the economic considerations mandated higher salaries for the faculty members of the largely male technical and professional schools, there naturally arose a salary differential from the more prevalently female educational, humanities and fine arts, and social sciences schools of the University. These economic forces were the cause of a collective wage differential shown by Plaintiffs' statistics between the men and women faculty in different schools of the University. No reliable showing was made of wage differentials between men and women faculty within a particular school of the University, nor for any particular men or women performing the same academic duties and holding the same academic rank. The court is not persuaded that women faculty members with the same qualifications as their male colleagues were being paid less in salary. The amorphous qualifications of academia make indefinite distinguishing marks, but considering department, rank, degrees, teaching experience and empirical experience there has been no proof of sexual discrimination in compensation at the University.

6. With regard to the professionals and administrators encompassed in the class, the court is persuaded that the pay plan structure implemented by the professional and administrative task force committee eradicated any possible sex discrimination in salary and promotion among University professionals and administrators. The court finds that red circling or green circling employees who are above or below pay quartile divisions was not extensive, and was resolved by proper job level adjustment without discriminating against women. Plaintiffs' contention that women professionals and administrators are disproportionately placed in lower job categories is not justified by the evidence presented. Moreover, the failure to demonstrate convincingly the availability of women to fill more or higher professional and administrative positions militates against the finding of discrimination.

7. This court finds that the Defendants progressively hired and promoted more

women from 1972 until the present, as their availability and qualifications increased. Any disproportion indicated by Plaintiffs' equivocal statistics exists because of economic factors in the market place and not because of any discrimination on the part of the Defendants. The court finds that the Defendants did not discriminate against the class of women in hiring, promotion, job assignment, salary, or any other employment practices.

*The Individual Claim of Plaintiff Hill*

8. Plaintiff, Sharon Hill, was initially employed by the University in 1969 as a clerk-typist in the Economics Department. In September, 1970, she transferred to the University Computing Center in the position of secretary. In August, 1973, she became a Research Assistant. In January, 1974, Plaintiff Hill's job was reclassified as Coordinator of Operations with a beginning salary of $9,120. Over the next year, Plaintiff was given additional raises and in February, 1975, was earning $10,881.90 per year. Dr. R. L. Motard, Ms. Hill's supervisor, felt that Ms. Hill's responsibilities were more in line with that of a coordinator rather than a supervisory manager. Ms. Hill had notice of the title change by way of a personnel action request from the Personnel Department, a copy of which was sent to her. Ms. Hill was never told she had supervisory powers over anyone on the technical staff. To the contrary, as early as the summer of 1974, the testimony demonstrated that Dean Kirkpatrick, Dean of the College of Engineering, specifically told Ms. Hill that she had no managerial powers over Mr. David Lowell, Assistant Analyst. Moreover, in December, 1974, Dean Kirkpatrick issued an organizational chart in an attempt to set out in graphic form Ms. Hill's job responsibilities. The testimony of the key figures involved in the Engineering Department, including Dean Kirkpatrick, Dr. Motard, Dr. Donaghey, and Mr. Killough, clearly demonstrated that no one except Ms. Hill saw her job duties as anything other than coordinator, i. e., making sure deadlines were met, scheduling users of the computer and preparing budget reports.

Ms. Hill, however, continued to conduct herself in a manner that assumed she had operational responsibility and control over the technical staff.

9. In November, 1974, the University of Houston hired Mr. Lewis Folkerth as a systems analyst to replace Mr. Lowell. Ms. Hill's duties were never substantially reduced, though modified upon the hiring of Mr. Folkerth. Mr. Folkerth was hired at a starting salary of $14,500. The testimony demonstrated that Ms. Hill had neither the experience nor the capability to work in Mr. Folkerth's position.

10. The evidence is clear that the market value and worth of the systems analyst, Lewis Folkerth, was considerably more than the market value of the coordinator of operations, Ms. Hill. Yet Ms. Hill persisted in seeking to be paid as much as Mr. Folkerth. Mr. Silber, the University salary adjuster, after a complete review of Ms. Hill's salary found that her job position and duties were not similar to Mr. Folkerth's. Mr. Silber did compare her salary to others with similar job responsibilities and found Ms. Hill to be entitled to a slight raise. Ms. Hill was notified that she would be entitled to a raise but she flatly refused to accept it since she felt that she was entitled to a salary comparable to Mr. Folkerth's. Shortly thereafter the working environment at the engineering computer laboratory became so hostile, due to Ms. Hill's belligerent attitude, that she was terminated.

11. Dr. Motard, upon returning from Europe in March, 1975, convened a meeting attended by Ms. Hill and Mr. Killough in order to help settle Ms. Hill's increasingly belligerent attitude. After the meeting, Dr. Motard, a long term friend and supporter of Ms. Hill, concluded that her attitude and ability to work with others had deteriorated to such an extent that Ms. Hill had to be terminated. Dean Kirkpatrick in an attempt fairly to view each side of the controversy requested from each engineer and from Ms. Sandy White, a woman who had worked in the same office as Ms. Hill, an opinion as to the conflict. Everyone in the engineering computer laboratory, including

Ms. White and Dr. Motard, both long time friends of Ms. Hill, felt that Ms. Hill should be terminated.

12. The evidence showed several reasons for Ms. Hill's termination. First, Ms. Hill's continuing insistence that Mr. Folkerth be fired. Second, Ms. Hill spent inordinate amounts of time on the telephone for non-business reasons and did not perform her job responsibilities adequately. Third, Ms. Hill could not communicate with and was inaccessible to the rest of the engineering computer laboratory team, often locking her door and refusing to see anyone. Fourth, Ms. Hill created and perpetuated a hostile attitude toward all members of the lab and made working conditions intolerable, so much so that Mr. Killough, an experienced and highly competent technical operator of the computer system, working on a voluntary basis, was driven to resignation.

13. The credible evidence demonstrated that Ms. Hill was terminated for good cause and that sex was not a factor in said termination. The court further finds that Ms. Hill was not paid inequitably on the basis of sex, and was not a subject of employer's retaliation because of the filing of an EEOC claim.

*The Individual Claim of Plaintiff Wilkins*

14. Plaintiff, Jeannine Wilkins, was hired on a free-lance basis by KUHT in early August, 1973, and was paid $50 per day or $6.25 per hour for her work.

15. At that time KUHT had a full time editor, Arnold Bergene, who was preparing to retire effective September 1, 1973. Mr. Baeur, the Station Manager, informed Ms. Wilkins that the position would be open but that because of the small amount of film editing available, Ms. Wilkins would be required to perform several other duties. Ms. Wilkins stated that she was interested in accomplishing assignments in research, writing, and television production, as well as the basic assignment of film editing.

16. Ms. Wilkins was hired on a full time basis in September, 1973, at a starting salary of $9,000. It must be noted that although her educational qualifications were adequate, she had little practical experience in film editing and in other areas of film and television work.

17. At the time Ms. Wilkins was hired, Mr. Bob Cozens, was the producer-director of KUHT film unit. Mr. Cozens was her immediate supervisor during her employment at KUHT.

18. In the latter part of September, 1973, the film unit began working on a mass transit film which was to be broadcast in October. Ms. Wilkins adequately edited all but about 3% of the film. Mr. Cozens sought aid on a particularly difficult thirty-second section of the film from Mr. Bryan Beasley, a previous co-worker film editor of Mr. Cozens with a great deal of experience in film editing. The evidence demonstrated that Mr. Cozens requested Mr. Beasley's aid not due to any form of discrimination against Ms. Wilkins or anyone else. Mr. Beasley's services were engaged on the mass transit film because:

(1) Mr. Beasley freely volunteered his time and efforts for no pay;

(2) The film cutting was particularly difficult and Mr. Cozens did not feel Ms. Wilkins had the capability to perform the task;

(3) The film had a two week deadline; and

(4) Ms. Wilkins was busy working on other parts of the film.

19. Mr. Beasley did not again work at KUHT until March, 1974. Between September 20, 1973, and March 17, 1974, some of the programs on which Ms. Wilkins worked were:

(1) The Killers, November through January—film editor;

(2) Space Proposals—October through January—writing proposals;

(3) Texas history proposal, December through February—writing proposal;

(4) Human realities, December through January—production assistant;

(5) Shell Oil, January through February—film editor;

(6) Noticias—news in Spanish—February to May—film editor; and

(7) Signing with Cindy—February to mid-March—associate producer.

It is clear from the projects to which Ms. Wilkins was assigned, that Mr. Cozens was giving her an opportunity to work in various areas of film and television.

20. As early as January, 1974, Ms. Wilkins indicated to Mr. Cozens that she was dissatisfied with her salary and looking for another job. This was approximately 2½ months before Mr. Beasley was hired at KUHT.

21. In February, 1974, production both in the film and television departments increased. Preparation for the television auction, the most important event of the year for KUHT, was beginning. Ms. Wilkins was needed to work on this project. In mid-March the film unit began working on the Rice film production. Ms. Wilkins was the writer and production manager of that particular film.

22. On March 17, 1974, Mr. Beasley was hired as a free-lance film editor at a rate of $45.45 per day or $5.58 per hour, less than the free-lance rate of Ms. Wilkins in August of the previous year. The evidence demonstrated several reasons for hiring Mr. Beasley. Ms. Wilkins was needed to work on the auction; Mr. Beasley had far superior qualifications in film editing; and Ms. Wilkins was actively seeking other employment at that time, thus causing Mr. Cozens to look for another film editor as a replacement.

23. The evidence was clear that Mr. Cozens did not discharge another employee and assign her duties to Ms. Wilkins, but rather reinstated that same employee in the same job a few days later.

24. Although Ms. Wilkins resigned in mid-April, she continued to work at the station until July 31, 1974. During that time she was engaged in various important projects for the station, which aided her in obtaining a better and higher paying job at North Texas State University at Denton, Texas. The evidence demonstrated that Ms. Wilkins is now teaching classes at North Texas State in other areas of film and television, as well as film editing.

25. The court finds that sex was not a factor in KUHT employment decisions and practices regarding Ms. Wilkins.

## CONCLUSIONS OF LAW

1. The court has jurisdiction of this action and jurisdiction and venue over the parties under federal statutory and pendent jurisdiction principles.

2. This action was and is properly certified as a class action pursuant to Fed.R. Civ.P. 23(a) and (b)(2).

3. The employment practices of the Defendants with regard to the named Plaintiffs and the members of the class, delineated in the court's findings of fact, do not constitute unlawful employment practices in violation of Title VII on the basis of sex, nor do they constitute unlawful retaliation in violation of 42 U.S.C. § 2000e–3(a); nor do they constitute a maintenance of unlawful wage differentials in violation of the Equal Pay Act, 29 U.S.C. § 216; nor do they constitute an unlawful sex discrimination in violation of the Texas Constitution.

5. Therefore Plaintiffs Sharon Hill, Jeannine Wilkins and the members of the class certified will take nothing from the Defendants, and will be taxed with costs of court.

All findings of fact more properly denominated as conclusions of law are hereby adopted as such. All conclusions of law more properly denominated as findings of fact are hereby adopted as such.