Jeannine W. WILKINS and Sharon D. Hill, Individually and on Behalf of all Others Similarly Situated, Plaintiffs,

v.

The UNIVERSITY OF HOUSTON, Defendant.

Civ. A. No. H–75–644.

United States District Court, S.D. Texas, Houston Division.

Oct. 10, 1989.

Carol Nelkin, Nelkin & Nelkin, Houston, Tex., for plaintiffs.

Lauri J. Schneidau, Asst. Atty. Gen., Austin, Tex., for defendant.

## MEMORANDUM AND ORDER

LAKE, District Judge.

Jeannine Wilkins and Sharon Hill filed this action on April 24, 1975, alleging that the University of Houston ("U of H") utilized and maintained employment policies and practices that discriminated against plaintiffs and all similarly situated females on the basis of their sex in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*, the Equal Pay Act, 29 U.S.C. § 201 *et seq.*, and Section 3a of the Texas Constitution. On May 18, 1978, the case was certified as a class action maintainable by plaintiffs in their own behalf and in behalf of all female applicants and employees of the U of H in jobs defined as faculty or professional and administrative positions on the Central Campus of the U of H. The case was tried to the late Judge Ross Sterling from June 23 to July 3, 1978. On June 13, 1979, Judge Sterling made written Findings of Fact and Conclusions of Law, finding in favor of defendant on all causes of action. *Wilkins v. University of Houston,* 471 F.Supp. 1054. Final Judgment was entered on June 15, 1979.

On August 28, 1981, the Fifth Circuit affirmed the denial of individual relief to the class representatives Wilkins and Hill and affirmed the denial of relief on all class claims except the Title VII compensation claim of a portion of the professional and administrative staff class. The compensation claims of those professional and administrative staff class members who were in the academic division were remanded for determination of appropriate relief. *Wilkins v. University of Houston,* 654 F.2d 388 (5th Cir.1981). Plaintiffs' Petition for Rehearing and Suggestion of Rehearing En Banc were denied on December 7, 1981. *Wilkins v. University of Houston,* 662 F.2d 1156 (5th Cir.1981). On October 4, 1982, the Supreme Court vacated the opinions of the Fifth Circuit and remanded the case for further consideration in light of

the Court's opinions in *Pullman–Standard v. Swint,* 456 U.S. 273, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982), and *General Telephone Co. of the Southwest v. Falcon,* 457 U.S. 147, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982). *University of Houston v. Wilkins,* 459 U.S. 809, 103 S.Ct. 34, 74 L.Ed.2d 47 (1982).

On remand from the Supreme Court, the Fifth Circuit held that the case should be remanded to this Court "... for a re-examination by it under *Falcon* principles in the first instance of the certification of the sub-class and representatives of it." *Wilkins v. University of Houston,* 695 F.2d 134, 135 (5th Cir.1983). The Fifth Circuit also instructed this Court to hold such further proceedings as this Court "shall think fit" on the Title VII compensation claims of the sub-class of professional and administrative staff members in the academic division. *Id.*

On January 24, 1989, after conducting an evidentiary hearing, this Court granted the Motion to Intervene of Ann Tofft and Noel McClure ("Intervenors") and held that they were adequate class representatives of the sub-class identified by the Fifth Circuit, which consists of women in the academic division of the professional and administrative staff on the central campus of the U of H. The Court further found that the Intervenors met all requirements of Rule 23(b)(2) regarding numerosity, common questions of law and fact, commonality, typicality and adequacy of class counsel. The Court certified the case as a class action maintainable for the class of women in the academic division of the professional and administrative staff in 1977 whose names appear on Plaintiffs' Ex. 32.

 The Court must now determine whether the members of the class as defined have been the victims of discrimination on the basis of their sex in violation of Title VII. The parties agree that a disparate treatment analysis is appropriate.[1]

*Statement of Facts*

Having reviewed the record in this case, the Court makes the following findings of fact and conclusions of law.

1. Intervenors and the other members of the class were employed by the U of H in professional and administrative staff jobs in 1977.

2. The professional and administrative staff at the U of H, referred to as the "P & A staff," consisted of those salaried (as opposed to hourly paid) non-faculty employees of the U of H who are employed in supervisory and management level jobs covered by a separate P & A pay plan. (Tr. 95, 404–405)

3. The evidence, and in particular the testimony of U of H's witnesses, reveals a complete lack of uniform standards regarding initial classification, titles, pay, promotions, and other employment policies affecting those persons holding professional and administrative staff positions at the U of H prior to 1977. (Tr. 1049–1050 [Schneider], 404–405 [Silber]).

4. With regard to the P & A staff, Ms. Norma Schneider, U of H's affirmative action officer, testified:

There was no plan that included [professional women], and our hiring salary was not very systematic, it just depended on the amount in the budget.

I personally felt, and the personnel director agreed with me, that inequities had grown up in the professional plan, particularly since the earlier years when I was employment manager, there was a lot of individual departmental hiring and they just hired people in and set an arbitrary salary.

We felt that if there were inequities, particularly among or between men and women, that that is where they were.

---

1. Because of Judge Sterling's death in January of 1988, defendant argued that Fed.R.Civ.P. 63 required that the case be retried. Since Judge Sterling entered findings of fact and conclusions of law, the Court concludes that Rule 63 does not require this Court to retry the case. Nothing in Rule 63 or cases explaining its applicability to situations similar to this preclude this Court from entering new findings of fact and conclusions of law after remand from a judgment entered by a predecessor judge. This is true even if such findings are contrary to those of the original judge. *See Halferty v. Pulse Drug Co.,* 864 F.2d 1185, 1188 (5th Cir.1989).

So we made the commitment in the affirmative action plan that we would develop a professional pay plan. (Tr. 1050)

5. Mr. William Silber, the former compensation manager of the U of H Central Campus, and the compensation director for the U of H Downtown Campus at the time of the 1978 trial, testified that in 1975 efforts were begun to develop a professional pay plan by evaluating the P & A job positions in order to develop objective standards for pay and promotions within these positions. (Tr. 403–413)

6. Mr. Silber and a group called the P & A Task Force Committee presented a P & A pay plan to the U of H administration in the fall of 1975. (Tr. 414) After further meetings with an outside consultant, the number of job levels in the plan was reduced from 15 to 9, and the plan was resubmitted to the U of H administration in January or February of 1976 (Tr. 417). The plan was not implemented immediately because of questions about the applicability of the Fair Labor Standards Act to certain jobs (Tr. 418). The P & A pay plan was finally adopted by the U of H administration in June of 1977, although even then it did not cover all jobs. (Tr. 1102–04)

7. In developing the P & A Pay Plan, the Task Force evaluated jobs, not incumbents. As finally adopted, the plan allocated jobs among nine job levels, with level 1 the lowest and level 9 the highest. A salary range was assigned to each job level. Each job level was further divided into four pay quartiles, with the first quartile being the lowest and the fourth quartile the highest. A salary range was then assigned to each quartile within a job level. (Plaintiffs' Ex. 34; Tr. 412–417, 422–428)

8. To implement the plan, the jobs of covered employees were assigned to a particular job level and quartile. The actual salaries of covered employees were then compared with the salary range for their job levels and quartiles. Mr. Silber testified that those employees who were actually being paid at a rate below the first quartile of their job level should have been given "green circle" rates to adjust their salaries to at least the minimum salary established for their job level. (Tr. 426–28) Employees who were being paid at a rate above the fourth quartile of their pay level should have been given "red circle" rates to denote that such persons were being paid more than the maximum salary value for their job level. Mr. Silber testified that since the plan dealt with jobs, not with individuals, it would not be appropriate to correct "green circle" disparities by lowering the job level of a person being paid a salary below the first quartile of his or her job level instead of raising his or her salary to the first pay quartile for the established job level. (Tr. 428)

9. The plan did not cure the existing inequities between male and female professional and administrative employees. Of 68 persons in the academic division covered by the P & A pay plan, 34 were male and 34 were female.[2] (Plaintiffs' Ex. 41; Table T–20 at 2; Plaintiff's Ex. 32)[3] If 20 of the 68 persons were paid salaries below the first quartile range of their job level, it would be expected that roughly half would be men and half would be women. (Tr. 565–66) According to the evidence, however, in 1976 3 men and 17 women were being paid below the first quartile for their job levels. (Tr. 563–64; Plaintiffs' Ex. 41: Table T–20 at 2).[4] The probability of this

---

**2.** Although Dr. Thrall, who prepared Plaintiffs' Ex. 41, calculated 33 women in this group of 68 (Tr. 563–64; Plaintiffs' Ex. 41; Table T–20 at 2), the parties agree there were actually 34 women and 34 men in this group.

**3.** The 68 members of the academic division of the P & A staff are those persons listed on Plaintiffs' Ex. 32 in job classifications 5 and below. Those persons in job classifications 6 and above are higher-level administrators whose job classifications according to defendant

U of H's records indicated they were in a separate category from the 68 P & A staff members.

**4.** The Fifth Circuit included Ms. Norris in its count of persons being paid below the first quartile. (*See* 654 F.2d at 406, n. 27). Although Ms. Norris is a member of the class, due to her job classification level 7 (see Plaintiffs' Ex. 32), she was not included in the 68 P & A staff members analyzed by plaintiffs' expert, Dr. Thrall (Tr. 563–64).

gender-based imbalance occurring by chance is 4 in 10,000 (Tr. 565–66). Such a probability is remote enough to eliminate chance as a factor to explain this disparity and to leave unrebutted the inferential likelihood that the disproportion was solely or primarily gender-based. Four employees covered by the plan were being paid salaries above the fourth quartile range of their job level. All were men (Plaintiffs' Ex. 32).

10. Despite Mr. Silber's testimony that application of the plan would permit no justification for demoting anyone who was earning a salary below the first quartile, the jobs of 5 women in the academic division of the P & A staff who were being paid salaries below the first quartile range (and the jobs of two other women) were reclassified to lower job levels after the P & A plan was enacted. No jobs filled by male members of the P & A staff were reclassified to lower levels. (Plaintiffs' Exs. 32, 33 and 43; Tr. 567–70)

11. Notwithstanding the efforts of the P & A Task Force to develop a formal P & A pay plan, ostensibly to inject consistency and predictability into the otherwise chaotic P & A compensation and promotion system, the evidence establishes that implementation of the P & A plan was utilized in a discriminatory manner against female members in the academic division of the professional and administrative staff.

### Conclusions of Law

1. As the Fifth Circuit recognized in its original *Wilkins* decision, the facts presented by the Intervenors coincide with those reviewed by the Supreme Court in *County of Washington v. Gunther*, 452 U.S. 161, 101 S.Ct. 2242, 68 L.Ed.2d 751 (1981). In *Gunther* the Supreme Court observed that:

Respondents' claim is not based on the controversial concept of "comparable worth," under which plaintiffs might claim increased compensation on the basis of a comparison of the intrinsic worth or difficulty of their job with that of other jobs in the same organization or community. Rather, Respondents seek to prove, by direct evidence, that their

wages were depressed because of intentional sex discrimination, consisting of setting the wage scale for female guards, but not for male guards, at a level lower than its own survey of outside markets and the worth of the jobs warranted.

452 U.S. at 166, 101 S.Ct. at 2246. In rejecting Petitioners' claim that such a cause of action was prohibited by § 703(h) of Title VII, the Supreme Court in *Gunther* stated that any other holding would be

... flatly inconsistent with our past interpretations of Title VII as "prohibit[ing] all practices in whatever form which create inequality in employment opportunity due to discrimination on the basis race, religion, sex, or national origin." (Citations omitted)

452 U.S. at 180, 101 S.Ct. at 2253.

2. In *Plemer v. Parsons–Gilbane*, 713 F.2d 1127 (5th Cir.1983), the Court rejected the plaintiff's Title VII claims for failure to demonstrate the type evidence produced in *Gunther*. However, in doing so the Fifth Circuit once again analyzed the evidence presented by the Intervenors in the instant case and found that such evidence met the *Gunther* standards. The Fifth Circuit held:

In *Wilkins v. University of Houston*, [citations omitted], in which this Court considered a *Gunther* claim, the plaintiffs produced the type of direct evidence discussed in *Gunther*. The Plaintiffs in *Wilkins* showed that the University had established a pay structure which prescribed the lowest and highest salaries which should be paid for each employee position, and that 18 of the 21 persons who were being paid less than the "low figure" were women.

Rather than offering the type of direct evidence that had been before the Courts in *Gunther* and *Wilkins*, Plemer attempts to make out her *Gunther* claim by comparing her job to that EEO officer William Willis.

. . . . .

... It is not the province of the courts, however, to value the relative work of Plemer's and Willis' differing duties and

responsibilities, given the absence of either evidence of a kind similar to that delineated in *Wilkins*, or any direct or otherwise clear evidence as to how the Company valued the positions. 713 F.2d at 1133–34. *See also Merrill v. Southern Methodist University*, 806 F.2d 600, 607 (5th Cir.1986).

■ 3. Intervenors have made out a *prima facie* case of discrimination based on sex against the class of women employed in the academic division of the professional and administrative staff. The U of H has failed to articulate a legitimate non-discriminatory reason for its adverse actions toward this class of female employees.

■ 4. Once the plaintiff makes a *prima facie* case, a presumption is created that the employer discriminated against the employee. "If the trier of fact believes the plaintiff's evidence, and if the employer is silent in the face of the presumption, the court must enter judgment for the Plaintiff because no issue of fact remains in the case." *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

5. Intervenors established a *prima facie* case of employment discrimination, which U of H failed to rebut. Accordingly, the Court finds that Intervenors have established liability under Title VII of the Civil Rights Act of 1964.

■ 6. The Court finds that the members of the class are presumptively entitled to back pay and such equitable relief as is necessary to put them in their rightful place. *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975).

7. In the event that any of the foregoing Findings of Fact are Conclusions of Law, they are adopted as such. In the event that any of the foregoing Conclusions of Law are Findings of Fact, they are adopted as such.